**SHEET METAL WORKERS' INTERNATIONAL ASSOCIATION, Appellant,**

v.

**BURLINGTON NORTHERN RAILROAD COMPANY, Appellee.**

No. 88–2142.

United States Court of Appeals, Eighth Circuit.

Submitted Jan. 9, 1989.

Decided Jan. 10, 1990.

Michael S. Wolly, Washington, D.C., for appellant.

Richard J. Schreiber, Chicago, Ill., for appellee.

Before WOLLMAN and BEAM, Circuit Judges, and Floyd R. GIBSON, Senior Circuit Judge.

WOLLMAN, Circuit Judge.

The Sheet Metal Workers' International Association (the Association) appeals the decision of the district court[1] denying its request for declaratory and injunctive relief under the Railway Labor Act (the RLA), 45 U.S.C. §§ 151–188. The Association sought to enjoin the Burlington Northern Railroad Company (BN) from having employees of its wholly-owned subsidiary, Electro–Northern, Inc., repair and maintain locomotives owned or leased by Oakway, Inc. until bargaining procedures required by the RLA were exhausted. We affirm the denial of injunctive relief.

## I. BACKGROUND

The Association is the exclusive bargaining representative for sheet metal workers employed by BN. The Association and BN are parties to a collective bargaining agreement that governs rates of pay, rules, and working conditions. The scope clause of their agreement provides that work required on locomotives "acquired through purchase or lease, will not be subcontracted outside the warranty period."

On July 30, 1984, the Association served a bargaining proposal on BN pursuant to section 6 of the RLA, 45 U.S.C. § 156, to amend the existing collective bargaining agreement. The notice stated the following:

Effective September 1, 1984 the existing agreements between this carrier and the Sheet Metal Workers' International Association shall be amended to provide that all work or services presently performed by the Sheet Metal Workers in any manner or hereafter assigned to the Sheet Metal Workers shall not be contracted, transferred, assigned, or relocated in whole or in part and shall be performed by the Sheet Metal Workers covered by this agreement in any department or subdivision of this carrier whether on or off the property of this carrier except by written agreement between the duly authorized representative of the Sheet Metal Workers' International Association and this carrier.

The statutory bargaining procedures have not yet been exhausted on this notice.

In October 1986, BN entered into an Electrical Power Purchase Agreement (EPPA) with Oakway, Inc., a subsidiary of Connell Finance Company, Inc. Oakway agreed to provide BN the use of 100 locomotives (less than four percent of the approximately 2,600 locomotives owned or leased by BN). BN agreed to pay a rate determined by the amount of electrical power generated by the locomotives, as measured in megawatt hours by means of microprocessors installed on the locomotives. The agreement provides that BN will purchase a minimum of 240,000 megawatt hours per six month period on a "take or pay" basis. The agreement further provides that BN is granted no ownership, leasehold, or other proprietary interest in any of the locomotives used to generate the electrical power purchased by BN. The EPPA requires Oakway to ensure that the locomotives are repaired and maintained. To meet this obligation, Oakway contracted with the Electro Motive Division of General Motors (EMD) to repair and maintain the locomotives.

After BN signed the EPPA with Oakway, several shopcraft unions threatened a nationwide strike against all carriers, in-

---

1. The Honorable D. Brook Bartlett, United States District Judge for the Western District of Missouri.

cluding BN. The Association was not included among these unions. Various individual carriers, including BN, filed an action in the United States District Court for the Northern District of Illinois to enjoin the strike on the ground that the controversy regarding the EPPA was a minor dispute.

The nationwide strike was enjoined and the conflict was found to be subject to arbitration because the court determined that the dispute was minor. *See National Ry. Labor Conf. v. International Ass'n of Machinists & Aerospace Workers*, 124 L.R.R.M. 2224, 2230–31, 1986 WL14640 (N.D.Ill.1986), *aff'd*, 830 F.2d 741 (7th Cir. 1987). The injunction against striking was conditioned on BN's maintaining the status quo while the arbitration was pending. *Id.* at 2231–32. In accordance with the district court's order, the dispute was submitted to the adjustment board having jurisdiction over the 1964 national shopcraft agreement and the local BN agreement. Although the Association had not been a party in the district court, it was a party to the arbitration. *See Burlington N. R.R. v. Sheet Metal Workers Int'l Ass'n*, Special Board of Adjustment No. 570, Award No. 734, Case No. 1092 (July 10, 1987). After concluding that it had no proper basis for not complying with the district court's finding that the dispute was minor, the board determined that it lacked jurisdiction to hear the dispute because the dispute did not fall within either the employee protection or subcontracting articles of the collective bargaining agreement.

In an effort to avoid further litigation, BN formed a new wholly-owned subsidiary, Electro–Northern, Inc. (Electro–Northern), to provide the work force and equipment for EMD to maintain the locomotives. Electro–Northern began operations on July 15, 1988, at facilities leased from BN in North Kansas City, Missouri. Of the twenty-six employees constituting Electro–Northern's work force, thirteen are former EMD employees, and thirteen are former BN employees from the machinists' and electricians' crafts. Major repairs on the Oakway locomotives, such as overhaul work, are performed by all crafts, including members of the Association, at BN's facility in West Burlington, Iowa.

When the Association learned about the Electro–Northern arrangement, it protested that the arrangement violated the status quo provisions of the RLA. BN denied this claim. The Association then filed this action seeking to enjoin BN from commencing the Electro–Northern operation.

The district court denied the Association's motion for a preliminary injunction. The district court found that the motion was premised on the existence of work at the North Kansas City facility that was required to be done by the Association's members under the collective bargaining agreement between the Association and BN. Resolution of this dispute, according to the court, therefore involved interpreting and applying the parties' existing agreement. Because the court found that the dispute involved a matter covered by the agreement, it held that the dispute was minor and therefore denied injunctive relief.

## II. DISCUSSION

Denial of injunctive relief will not be reversed on review unless the trial court "clearly erred in its characterization of the facts, made a mistake of law, or abused its discretion in considering the equities." *Brotherhood of Maintenance of Way Employees, Lodge 16 v. Burlington N. R.R.*, 802 F.2d 1016, 1020 (8th Cir.1986) (*Lodge 16*). Moreover, "our inquiry as to the probity of an injunction is limited to those issues directly related to the injunction, for '[a]n injunction does not settle a dispute—it simply disables one of the parties.'" *International Ass'n of Machinists, Dist. Lodge No. 19 v. Soo Line R.R.*, 850 F.2d 368, 374 (8th Cir.1988), *cert. denied*, ⸺ U.S. ⸺, 109 S.Ct. 1118, 103 L.Ed.2d 181 (1989) (quoting *Burlington N. R.R. v. Brotherhood of Maintenance of Way Employees*, 481 U.S. 429, 451, 107 S.Ct. 1841, 1854, 95 L.Ed.2d 381 (1987)). Whether an injunction is appropriate depends on the nature of the dispute, which is a question of law requiring de novo review. *Id.*

## A. Resolution Process for Major and Minor Disputes

One purpose of the RLA is to prevent the disruption of the Nation's rail service by requiring unions and management to attempt to settle all contractual disputes and minor grievances using the procedures provided in the RLA. 45 U.S.C. § 151a. The RLA requires both the union and the railroad to negotiate whenever a dispute arises. 45 U.S.C. § 152 First, Second. If negotiation fails to resolve the dispute, the dispute takes one of two courses, depending upon whether the dispute is characterized as major or minor.[2]

■ A dispute is major if one party seeks to change the rates of pay, rules, or working conditions in a manner not contemplated by the collective-bargaining agreement. If direct negotiation fails and the dispute is characterized as major, the RLA requires the parties to undergo an "almost interminable process." *See Brotherhood of Maintenance of Way Employees v. Chicago & N.W. Transp. Co.*, 827 F.2d 330, 333 (8th Cir.1987), *cert. denied*, 485 U.S. 988, 108 S.Ct. 1291, 99 L.Ed.2d 502 (1988). Initially, either party may invoke the services of the National Mediation Board (NMB). 45 U.S.C. § 155, First. If mediation fails, the NMB must attempt to persuade the parties to submit the controversy to arbitration, which is binding only if both parties consent. 45 U.S.C. § 155, First, § 157. If the parties fail to submit to arbitration, the President may create an Emergency Board to help resolve the dispute. *See* 45 U.S.C. § 160. During this entire process, neither party may unilaterally alter the status quo. *See Brotherhood of R.R. Trainmen v. Jacksonville Terminal Co.*, 394 U.S. 369, 379, 89 S.Ct. 1109, 1115, 22 L.Ed.2d 344 (1969).

■ If a dispute between a carrier and its employees is characterized as minor, a different resolution process is followed. All disputes over the "interpretation or application" of existing agreements and practices that are not resolved during direct negotiations between the parties must be submitted for final arbitration to the National Railroad Adjustment Board. *See* 45 U.S.C. § 153, First (i). *See also Brotherhood of R.R. Trainmen v. Chicago River & I. R.R.*, 353 U.S. 30, 39, 77 S.Ct. 635, 639, 1 L.Ed.2d 622 (1957); *International Ass'n of Machinists v. Soo Line R.R.*, 850 F.2d at 376. In addition, the carrier is not required to maintain the status quo. Minor changes in working conditions may be implemented while settlement is sought through arbitration. *Id.* ("While the controversy is pending before the Board, the carrier may apply its reasonable interpretation of the disputed agreement.") *See also Brotherhood of Locomotive Engrs. v. Boston & Maine Corp.*, 788 F.2d 794, 797 n. 5 (1st Cir.), *cert. denied*, 479 U.S. 829, 107 S.Ct. 111, 93 L.Ed.2d 59 (1986).

## B. Classifying a Dispute as Major or Minor

Determining the difference between a major and minor dispute is "often a question of degree and turns upon the facts in each case." *Lodge 16*, 802 F.2d at 1021. As explained by the United States Supreme Court, major disputes are

> disputes over the formation of collective agreements or efforts to secure them. They arise where there is no such agreement or where it is sought to change the terms of one, and therefore the issue is not whether an existing agreement controls the controversy. They look to the acquisition of rights for the future, not to assertion of rights claimed to have vested in the past.

*Elgin, J. & E. Ry. v. Burley*, 325 U.S. 711, 723, 65 S.Ct. 1282, 1290, 89 L.Ed. 1886 (1945). A minor dispute, on the other hand,

> contemplates the existence of a collective agreement already concluded or, at any rate, a situation in which no effort is made to bring about a formal change in terms or to create a new one. The dispute relates either to the meaning or proper application of a particular provi-

---

**2.** The terms major and minor dispute do not appear in the RLA itself. Instead, they are judicially-created nomenclature for the statutory categories. *See Elgin, J. & E. Ry. v. Burley*, 325 U.S. 711, 723–24, 65 S.Ct. 1282, 1289–90, 89 L.Ed. 1886 (1945).

sion with reference to a specific situation or to an omitted case.

*Id. See also Lodge 16,* 802 F.2d at 1021–22.

The Supreme Court recently summarized its holding in *Burley:*

> This Court has not articulated an explicit standard for differentiating between major and minor disputes. It adopted the major/minor terminology, drawn from the vocabulary of rail management and rail labor, as a shorthand method of describing two classes of controversy Congress had distinguished in the RLA: major disputes seek to create contractual rights, minor disputes to enforce them.

*Consolidated Rail v. Railway Labor Exec. Ass'n,* — U.S. —, 109 S.Ct. 2477, 2479–80, 105 L.Ed.2d 250 (1989). The Court went on to point out that the line of demarcation between major and minor disputes drawn in *Burley*

> looks to whether a claim has been made that the terms of an existing agreement either establish or refute the presence of a right to take the disputed action. The distinguishing feature of such a case is that the dispute may be conclusively resolved by interpreting the existing agreement.

*Id.* 109 S.Ct. at 2481.

■ Characterizing the nature of the dispute "depends on whether it is arguably comprehended within the agreement of the parties." *Lodge 16,* 802 F.2d at 1022. To make this determination, the court must determine the terms of the agreement. The parties' agreement includes the written collective-bargaining agreement and their past practices. *Id.* The court, however, need not interpret the terms of the agreement. As we have stated, "it is not our function to interpret or construe the language of the collectively bargained-for agreements between the parties * * *; rather, our function is to determine whether this case implicates a question of contract interpretation." *International Ass'n of Machinists v. Soo Line R.R.,* 850 F.2d at 376 (citing *International Ass'n of Machin-*

*ists v. Northwest Airlines, Inc.,* 843 F.2d 1119, 1122 (8th Cir.1988)).

We have applied the following factors in determining whether a dispute is comprehended within an agreement: whether "the agreement is 'reasonably susceptible' of the interpretations sought by both the employer and the employees"; whether "the employer's action can be arguably justified under the terms of the existing agreement"; and whether "the employer's argument that its actions are within the contract is 'obviously insubstantial.'" *International Ass'n of Machinists v. Soo Line R.R.,* 850 F.2d at 376. *See also id.* at 376 ("dispute is minor unless the claims of contractual justification are 'frivolous'"); *id.* at 377 (quoting *Brotherhood of Locomotive Engineers v. Atchison T. & St. F. Ry.,* 768 F.2d 914, 920 (7th Cir.1985)) ("when in doubt, the courts construe disputes as minor"); *Alton & S. Lodge No. 306 Brotherhood Ry. Carmen v. Alton & S. Ry.,* 849 F.2d 1111, 1113 (8th Cir.1988), *cert. denied,* — U.S. —, 109 S.Ct. 3214, 106 L.Ed.2d 565 (1989) (courts construe disputes as minor "when the surrounding circumstances are ambiguous").

Other courts of appeals have applied variants of the foregoing factors. Referring to the Third Circuit's "arguably justified," "not obviously insubstantial" standard for determining whether a dispute is major or minor in nature, the Supreme Court stated in *Consolidated Rail:*

> Verbal formulations of this standard have differed over time and among the Circuits: phrases such as "not arguably justified," "obviously insubstantial," "spurious," and "frivolous" have been employed. * * * "These locutions are essentially the same in their result. They illustrate the relatively light burden which the railroad must bear" in establishing exclusive arbitral jurisdiction under the RLA.

*Consolidated Rail,* 109 S.Ct. at 2482 (footnote omitted) (quoting *Lodge 16,* 802 F.2d at 1022). The Court then summarized the test as follows:

> Where an employer asserts a contractual right to take the contested action, the

ensuing dispute is minor if the action is arguably justified by the terms of the parties' collective-bargaining agreement. Where, in contrast, the employer's claims are frivolous or obviously insubstantial, the dispute is major.

*Id.*

## C. The Dispute Between BN and the Association

■ The Association argues that the serving of its section 6 notice is sufficient to enjoin BN, contending that the notice specifically addresses arrangements such as the EPPA. The serving of a section 6 notice, however, is not conclusive proof that a controversy is major. *See Missouri Pac. Joint Protective Bd., Brotherhood Ry. Carmen v. Missouri Pac. R.R.*, 730 F.2d 533, 536 n. 3 (8th Cir.1984). Holding otherwise would invite abuse of the notice requirement. Parties would be

> likely to serve such a notice in any dispute arising out of any ambiguous situation so as thereby to make the controversy appear more like a major dispute. Or they may seek to bring the particular conflict at issue within the bounds of an outstanding Section 6 notice that in reality does not relate to that dispute.

*Rutland Ry. v. Brotherhood of Locomotive Engrs.*, 307 F.2d 21, 33 (2d Cir.1962), *cert. denied*, 372 U.S. 954, 83 S.Ct. 949, 9 L.Ed.2d 978 (1963) (citation omitted).

■ The parties dispute whether the current agreement of the parties permits BN to use non-Association employees at BN's wholly-owned subsidiary to maintain and repair locomotives used by BN under the EPPA. As indicated earlier, the scope clause of the collective-bargaining agreement provides that Association employees are entitled to perform the sheet metal work on all locomotives leased or purchased by BN. BN argues that because the locomotives generating the electrical power covered by the EPPA are neither purchased nor leased, the current agreement therefore permits a subsidiary to repair and maintain locomotives because the

scope clause does not specifically prohibit it.

As indicated above, the parties' past practices may have a bearing on what is comprehended within the parties' labor agreement. *Lodge 16*, 802 F.2d at 1022. *See also Consolidated Rail*, 109 S.Ct. 2485. BN argues that its long-standing practice of utilizing shipper-owned and third-party owned freight cars, maintenance of which is performed by non-BN personnel, as well as its operation of Amtrak locomotives, maintenance of which is also performed by non-BN personnel, has broadened the scope clause of the agreement to permit the Electro–Northern agreement with EMD. The Association counters by pointing out that because Association members have never performed work on freight cars and because Association members in fact perform work on Amtrak locomotives, these past practices have not ripened into an implied term of the agreement with BN. *See United Transp. Union, Local Lodge No. 31 v. St. Paul Union Depot Co.*, 434 F.2d 220, 222–23 (8th Cir.1970), *cert. denied*, 401 U.S. 975, 91 S.Ct. 1194, 28 L.Ed.2d 324 (1971). The Association's argument may ultimately prove to be well taken, but our task is not to determine whether BN's position regarding the practices is correct, but rather whether it is arguable. Likewise, it is not our role to speculate as to the practical effect of the past practices. *Maine Cent. R.R. Co. v. United Transp. Union*, 787 F.2d 780, 782–83 (1st Cir.1986); *National Ry. Labor Conf. v. International Ass'n of Machinists*, 830 F.2d at 749.

We conclude that this dispute may be conclusively resolved by interpreting the scope clause of the existing agreement between the Association and BN. Accordingly, the dispute is minor. *Consolidated Rail*, 109 S.Ct. at 2481. It will be for the Adjustment Board to determine whether the purchase of electrical power under the EPPA is the functional equivalent of a lease of locomotives within the meaning of the scope clause of the agreement.[3]

---

**3.** BN points to the differences between the EPPA and BN's 1982 locomotive lease, which, among other things, gives BN exclusive use and

possession of designated locomotives and requires BN to maintain each locomotive in good operating order. There are other differences

In so holding, we agree with the Court of Appeals for the Seventh Circuit that BN's contractual justification, however improbable it may be, is nonetheless plausible. The fact that BN's contract interpretation may be questionable—and may be wrong—does not make it frivolous. *National Ry. Labor Conf.*, 830 F.2d at 748–49. The dispute is arguably comprehended within the parties' agreement. *Lodge 16*, 802 F.2d at 1022. It is not our function to interpret or construe the language of the scope clause of the agreement. BN's argument that the EPPA permits it to perform the maintenance work on the Oakway locomotives through Electro–Northern is not frivolous—though it may well be proved incorrect—nor obviously insubstantial. In view of the "light burden" BN must bear in establishing exclusive arbitral jurisdiction under the RLA and the fact that in doubtful cases we construe disputes as minor, we hold that the dispute in question is minor and thus subject to arbitration.

In view of our holding on the scope clause of the parties' agreement, we need not pass upon the district court's alternative holding that under Rule 27(e) of the agreement it is possible that there would be no work for Association members at the North Kansas City facility.

We agree with the district court that the circumstances of this case do not warrant injunctive relief pending resolution of the dispute through the arbitration process. Accordingly, the district court's order denying a preliminary injunction is affirmed.

alleged, but these will suffice to illustrate that BN's position is not totally without substance.