**BROTHERHOOD RAILWAY CARMEN OF THE UNITED STATES AND CANADA, DIVISION OF TRANSPORTATION COMMUNICATIONS UNION; Brotherhood Railway Carmen of the United States and Canada, Missouri Pacific Joint Protective Board, Division of Transportation Communications Union; Brotherhood Railway Carmen of the United States and Canada, Southern Pacific Joint Protective Board, Division of Transportation Communications Union; Brotherhood Railway Carmen of the United States and Canada, Denver & Rio Grande Western–Western Pacific Joint Protective Board,**

---

| Attorney | Hours |
|----------|-------|
| Oberman | 88.35 |
| Mueller | 10.50 |
| Johnson | 58.38 |
| Hyman | 142.50 |

| Rate | Total |
|------|-------|
| $175 | $15,461.25 |
| 125 | 1,312.50 |
| 125 | 7,297.50 |
| 80 | 11,400.00 |
| | $35,471.25 |

fee litigation, leaving Nanetti $23,056.31 in fees for this period.

Division of Transportation Communications Union; Brotherhood Railway Carmen of the United States and Canada, Santa Fe Joint Protective Board, Division of Transportation Communications, Union, Appellants,

v.

MISSOURI PACIFIC RAILROAD COMPANY; Union Pacific Railroad, Union Pacific Railroad Company; Southern Pacific Transportation Company; Atchison, Topeka & Santa Fe Railway Company; The Trailer Train Company, a corporation, Appellees.

No. 90–1736.

United States Court of Appeals, Eighth Circuit.

Submitted Jan. 10, 1991.

Decided Sept. 25, 1991.

C. Marshall Friedman, St. Louis, Mo., argued (Kenneth E. Rudd, St. Louis, Mo. and Mitchell M. Kraus, Rockville, Md., on the brief), for appellants.

I. Michael Greenberger, Washington, D.C., argued, for Mo. Pac.

Ronald M. Johnson, Washington, D.C., argued, for Trailer Train.

Robert S. Bogason, San Francisco, Ca., Guy Vitello, Chicago, Ill., Thomas J. Mikula & Mark S. Raffman, Washington, D.C., Mark B. Goodwin, Omaha, Neb., Robert J. Williams & William A. Callison, Chicago, Ill., Charles L. Warren & Karen L. Wingo, Washington, D.C., on the briefs, for appellees.

Before McMILLIAN, JOHN R. GIBSON and BOWMAN, Circuit Judges.

JOHN R. GIBSON, Circuit Judge.

The Brotherhood Railway Carmen and four of its internal divisions, or "joint protective boards," appeal from an entry of summary judgment against them on their claims that: 1) the four railroads violated the various provisions of the Railway Labor Act, 45 U.S.C. §§ 151–188 (1988) by leasing property to Trailer Train Company (TTX)[1] in order to allow TTX[1] employees, who are not members of the Carmen's union, to enter the property and make certain types of repairs to TTX-owned freight cars that are operated by the railroads; and 2) TTX and the railroads conspired to violate the Railway Labor Act. The district court[2] held that because the railroads' arguments that their actions were justified under the current agreements were not "frivolous" or "obviously insubstantial," this dispute is a "minor dispute" subject to compulsory

---

1. Trailer Trains' freight cars all bear the letters TTX, and all of the parties use TTX to refer to the Trailer Train Company. We will use TTX here as well, despite our reservations about the use of acronyms.

2. The Honorable Dean Whipple, United States District Judge for the Western District of Missouri.

and binding arbitration under the Railway Labor Act. The district court thus concluded that it lacked subject matter jurisdiction over the claimed violations of the Act. It also held that it lacked jurisdiction over the conspiracy claim. The Carmen also appeal from the dismissal of their claim that TTX tortiously interfered with the Carmen's collective bargaining agreements with the railroads. The district court held that the tortious interference claims, raised under state law, were preempted by the Act. We affirm the order of the district court.

Each joint protective board represents Carmen employees at one of the four railroads, and each board has a collective bargaining agreement with its respective railroad. The railroads are "carriers" within the meaning of 45 U.S.C. § 151, First.

TTX, formed in 1955, is exclusively owned by twenty-one Class I railroad carriers, including the four railroads here. TTX owns freight cars that it supplies to railroads, which pay TTX a per diem and mileage rate. TTX does not have a collective bargaining agreement with the Carmen.

The collective bargaining agreements between the Carmen and the carriers contain rules known as "scope rules" that define the work jurisdiction of the Carmen. In general, these rules prohibit the carriers from assigning work that is classified in the agreement as Carmen's work to anyone other than Carmen. In addition to the collective bargaining agreements, two mediation agreements entered into in 1964 and 1975 by various "shop craft" unions and most of the nation's major railroads, including the four appellees, preclude the carriers from subcontracting work within the Carmen's work classification except under limited circumstances. These agreements are currently in effect and will remain so until changed under the "major dispute" procedures of the Railway Labor Act.

In 1986, one carrier that is not a party to this litigation, CSX Transportation, Inc.,

leased tracks to TTX to permit TTX employees to make certain minor repairs to TTX-owned freight cars that were being operated by CSX. These repairs, performed under standards promulgated by the Association of American Railroads, are called "AAR repairs." Historically, the Carmen employed by the carrier operating the cars have performed the AAR repairs. Although TTX has always retained the ultimate authority regarding the maintenance and repair of its cars, it has authorized the carrier operating the cars to perform the AAR repairs, an arrangement prescribed by the AAR rules.

Challenging the CSX's lease of track to TTX and the performance of AAR repairs by TTX employees, as well as a similar arrangement between the Baltimore and Ohio Railroad Company and TTX, the Carmen filed three grievances with the National Railroad Adjustment Board, the arbitral board established by Congress to adjudicate grievances under the Railway Labor Act. 45 U.S.C. § 153. The Adjustment Board ruled against the Carmen on two of the grievances, deciding that the collective bargaining agreements did not prohibit the leasing arrangement with TTX, and stating that the carriers had the right to lease their facilities as they saw fit.[3] *Brotherhood Ry. Carmen v. CSX Transp. Inc.*, Award No. 11574 (NRAB 2d Div. Aug. 31, 1988); *Brotherhood Ry. Carmen v. Baltimore & Ohio R.R.*, Award No. 11567 (NRAB 2d Div. Aug. 31, 1988).

Based on the Board's decisions stating that the agreements between the Carmen and carriers did not prohibit leases to third parties, the Carmen decided to address what they perceived as a "gap" in the agreements. In May 1988, the Carmen's joint protective boards served "section 6 notices" on the railroads, *see* 45 U.S.C. § 156, proposing to change the existing collective bargaining agreements to require

---

**3.** The Carmen prevailed in their grievance against the Baltimore and Ohio Railroad, *see Brotherhood Ry. Carmen v. Baltimore & Ohio R.R.*, Award No. 11562, (NRAB 2d Div. Aug. 31, 1988), with the board ruling that because nothing in the record contradicted the Carmen's assertion that the railroad "instituted" or "devised" the leasing plan to strip work from Carmen employees, that the railroad had consequently "evaded its collective bargaining agreements." Award at 4.

that all maintenance and AAR repairs on jointly owned freight cars or cars operated in "pooling arrangements" (such as with TTX) be performed by the carriers' employees.

The Carmen and the carriers [4] began negotiations over the proposed agreement language, and, in May 1989, they jointly sought mediation over the dispute. In the meantime, the carriers began leasing tracks at several of their facilities to TTX and began permitting TTX employees to use the leased tracks to make the AAR repairs. After the Carmen discovered the leases, they demanded that the carriers reinstate the status quo under 45 U.S.C. § 156 by terminating the leases with TTX and returning the AAR repair work to the Carmen pending completion of negotiations and mediation over the section 6 notices.

The carriers rejected this demand, and the Carmen then filed this action, alleging violation of certain provisions of the Railway Labor Act, tortious interference, and conspiracy to circumvent and violate certain provisions of the Act. The district court granted the carriers' motion for summary judgment and TTX's motion for dismissal holding that: 1) it lacked subject matter jurisdiction over the claimed violations of the Railway Labor Act, as the dispute is a minor one subject to compulsory and binding arbitration before the Adjustment Board; 2) the tortious interference claims brought under state law are preempted by the Railway Labor Act; and 3) that it lacked jurisdiction to review the conspiracy claim. *Brotherhood Ry. Carmen v. Trailer Train Co.*, No. 89–0942–CV–W–1, slip op. at 10–13, 1990 WL 102794 (W.D.Mo. Apr. 4, 1990). The district court also denied the Carmen's motions to compel discovery and to stay consideration of the defendants' motions as moot. *Id.* at 13.

## I.

The Carmen argue that this case presents a classic "major dispute" arising out of efforts to secure new terms in a collective bargaining agreement. They further allege that the carriers violated the status quo provisions of 45 U.S.C. § 156 by entering leases with TTX to permit TTX employees to make AAR repairs after the union had filed section 6 notices proposing new agreement language that would prohibit such arrangements. *See* 45 U.S.C. § 156. The carriers counter that while a section 6 notice indeed freezes the "status quo," the status quo encompasses actions that the carriers are arguably justified in taking under current agreements. They further assert that because their arguments of contractual entitlement are not "frivolous" or "obviously insubstantial," this dispute is a "minor" one under the Railway Labor Act.

The key question before us then, is whether we have subject matter jurisdiction over this case as a major dispute or whether we must defer to the exclusive arbitral jurisdiction of the Adjustment Board, which resolves all minor disputes.

We have had frequent occasion to ponder the distinction between the terms "major" and "minor," which do not appear in the Railway Labor Act but are used to signify which of the Act's dispute resolution procedures must be invoked in a particular situation. *Chicago & N.W. Transp. Co. v. Railway Labor Executives Ass'n*, 855 F.2d 1277, 1281 (7th Cir.1988); *cert. denied*, 488 U.S. 966, 109 S.Ct. 493, 102 L.Ed.2d 529 (1988).

In general, a major dispute involves an effort to secure new contractual rights, while a minor dispute involves the interpretation or application of an existing agreement. *Consolidated Rail Corp. v. Railway Labor Executives Ass'n*, 491 U.S. 299, 109 S.Ct. 2477, 2480, 105 L.Ed.2d 250 (1989); *Sheet Metal Workers Int'l Ass'n v. Burlington N. R.R.*, 893 F.2d 199, 202 (8th Cir.1990). Major disputes are governed by 45 U.S.C. §§ 152, Seventh, and 156. Section 152, Seventh, forbids a carrier from changing rates of pay, rules, or working conditions of employees "as embodied in agreements except in the manner pre-

---

**4.** The railroads engaged in national negotiations with the Carmen are represented by the National Carriers' Conference Committee and the National Railway Labor Conference.

scribed in such agreements or in section 156...." Sections 155 and 156 require the parties to "undergo an 'almost interminable process'" of bargaining and mediation. *Sheet Metal Workers*, 893 F.2d at 202. *See also Consolidated Rail*, 109 S.Ct. at 2480. Until they exhaust these procedures, the parties must maintain the status quo, which means that the employer may not implement contested changes in rates of pay, rules, or working conditions. 109 S.Ct. at 2480. Once the required procedures have been exhausted and no agreement has been reached, the "parties may resort to the use of economic force." *Id.*

■ In contrast, if a dispute is minor, and is not resolved by direct negotiations, it must be submitted for final arbitration before the Adjustment Board. *Sheet Metal Workers*, 893 F.2d at 202. *See* 45 U.S.C. § 153, First (i). The Adjustment Board has exclusive jurisdiction, and judicial review is limited. *Consolidated Rail*, 109 S.Ct. at 2481. While the Board's decision is pending, the "carrier may apply its reasonable interpretation of the disputed agreement." *International Ass'n of Machinists v. Soo Line R.R. Co.*, 850 F.2d 368, 376 (8th Cir. 1988) (en banc); *cert. denied*, 489 U.S. 1010, 109 S.Ct. 1118, 103 L.Ed.2d 181 (1989). A union may not strike over a minor dispute. *Chicago & N.W. Transp.*, 855 F.2d at 1283; *CSX v. United Transp. Union*, 879 F.2d 990, 997 (2d Cir.1989); *cert. denied*, —— U.S. ——, 110 S.Ct. 720, 107 L.Ed.2d 740 (1990).

■ The distinction between major and minor disputes rests on whether "the terms of an existing agreement either establish or refute the presence of a right to take the disputed action." *Consolidated Rail*, 109 S.Ct. at 2481. In *Consolidated Rail*, the Supreme Court approved the standard employed by various courts of appeal to determine whether a dispute is major or minor, stating: "Where an employer asserts a con-

tractual right to take the contested action, the ensuing dispute is minor if the action is arguably justified by the terms of the parties' collective-bargaining agreement. Where, in contrast, the employer's claims are frivolous or obviously insubstantial, the dispute is major." *Id.* at 2482.

Under this standard, the employer has the burden of establishing that its claims are not frivolous or obviously insubstantial, *id.* at 2482, 2489, but the burden is "relatively light." *Id.* at 2482. The court's role, thus, is not to interpret the agreement, but merely to determine whether the case "'implicates a question of contract interpretation.'" *Sheet Metal Workers*, 893 F.2d at 203 (quoting *Soo Line R.R.*, 850 F.2d at 376).

Before we determine whether the carriers here have met their burden, we address a threshold argument advanced by the union—that the "arguably justified" standard is simply inapplicable in a case in which the union has filed a section 6 notice. In such a case, the Carmen argue, the court's duty is to determine and freeze the status quo. The "arguably justified" standard, they assert, applies only when the union has not filed a section 6 notice, and the court is trying to determine whether the employer has a duty to file a section 6 notice and follow section 6 procedures before making a unilateral change in the rates of pay, rules, or working conditions.[5]

■ The Carmen's argument simply overlooks the vast number of cases that have addressed this precise point. Several circuits, including this one, have held that the service of a section 6 notice by the union does not transform a minor dispute into a major one. *See Sheet Metal Workers*, 893 F.2d at 204. *See also Air Line Pilots Ass'n Int'l v. Eastern Air Lines, Inc.*, 863 F.2d 891, 900 (D.C.Cir.1988); *CSX*, 879 F.2d at 1000 (once a dispute is

---

5. The Carmen rely heavily on *Detroit & Toledo Shore Line Railroad v. United Transportation Union*, 396 U.S. 142, 90 S.Ct. 294, 24 L.Ed.2d 325 (1969), where the Supreme Court held that the Railway Labor Act's status quo provision required the employer to freeze the "actual, objective working conditions out of which the dispute

arose" following the union's service of a section 6 notice. *Id.* at 154, 90 S.Ct. at 301. *Shore Line* is not applicable to the facts of this case, however, as the employer in *Shore Line* did not assert any reliance on past practices and the possibility of a minor dispute was not addressed.

found to be minor, the service of section 6 notices "would have no transforming or alchemizing effect upon that situation"); *Railway Labor Executives Ass'n v. Chesapeake W. Ry.*, 915 F.2d 116, 120 (4th Cir. 1990) *cert. denied,* —— U.S. ——, 111 S.Ct. 1312, 113 L.Ed.2d 246 (1991). *Chicago & N.W. Transp. Co. v. Railway Labor Executives Ass'n,* 908 F.2d 144, 151 (7th Cir. 1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 1073, 112 L.Ed.2d 1179 (1991). As the District of Columbia Circuit correctly pointed out, allowing a party "to characterize all disputes as 'major' through a unilateral action such as serving § 6 notices on the other party is unwise and contrary to the two-track procedure of the [Railway Labor Act]." *Air Line Pilots Ass'n,* 863 F.2d at 900.

The Carmen's argument that the district court has a duty to determine and freeze the status quo thus misses the mark because once the court finds that an employer's actions are arguably justified under the terms of existing agreements, the status quo issue is "mooted." *CSX,* 879 F.2d at 999. *See* also *Chicago & N.W. Transp. Co.,* 908 F.2d at 151 ("[a] union cannot freeze the status quo by demanding negotiations over something that the carrier is entitled to do unilaterally either because the collective bargaining agreement authorizes the carrier to do it or because it is within the carrier's 'management prerogatives....'").

■ We now turn to whether the carriers have met their burden of establishing that this dispute is minor. Whether a dispute under the Railway Labor Act is major or minor is a question of law that we review de novo. *Sheet Metal Workers,* 893 F.2d at 201; *Soo Line,* 850 F.2d at 374. We also review de novo the grant of summary judgment and will affirm only if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c).

■ The carriers rest their argument of contractual entitlement not on express agreement language, but on two other bases: 1) decisions by the Adjustment Board

construing similar collective bargaining agreements which state that nothing in those agreements prohibits the leasing of track to third parties and that the carriers' employees are not entitled by contract to repair equipment the carriers do not own; and 2) past practices by the carriers, acquiesced in by the Carmen, which the carriers argue establish an implied term in the parties' labor agreements permitting third parties to use leased tracks to repair their own cars.

The Adjustment Board decisions, interpreting the Carmen's collective bargaining agreements and similar agreements of other railway unions, state that carriers have the legal right to lease their facilities as they see fit, and that the union's rights under their agreements do not extend to work that the carrier does not control. *See, e.g., Brotherhood Ry. Carmen v. CSX Transp. Inc.,* Award No. 11574 (NRAB 2d Div. Aug. 31, 1988); *Brotherhood Ry. Carmen v. Baltimore & Ohio R.R.,* Award No. 11567 (NRAB 2d Div. Aug. 31, 1988). In *System Fed'n No. 7, Ry. Employees' Dep't, A.F. of L.—C.I.O. v. Burlington N. Inc.,* Award No. 6839 (NRAB 2d Div. Apr. 7, 1975), the Adjustment Board explained: "It is fundamental that [agreement] [r]ules ... cannot extend to and encompass work that does not belong to the [carrier]. The rules of the ... [a]greement apply only to work that the [c]arrier has to offer." *Id.* at 2.

■ In deciding whether a dispute is minor, we may consider "'customary and ordinary interpretations of the language of agreements.'" *CSX,* 879 F.2d at 998 (quoting *Rutland Ry. Corp. v. Brotherhood of Locomotive Eng'rs,* 307 F.2d 21, 34 (2d Cir.1962), *cert. denied,* 372 U.S. 954, 83 S.Ct. 949, 9 L.Ed.2d 978 (1963)). Here, the arbitration decisions do not state that the collective bargaining agreements expressly permit the leases; rather, they state that the agreements do not prohibit the leases. While the Adjustment Board's decisions lend some support to the carriers' position, their argument that past practices establish implied agreement terms presents a stronger claim.

It is well established that collective bargaining agreements may include implied as well as express terms. *Consolidated Rail,* 109 S.Ct. at 2485. Past practices rise to the level of an implied agreement when they have "ripened into an established and recognized custom between the parties." *Alton & S. Lodge No. 306 v. Alton & S. Ry.,* 849 F.2d 1111, 1114 (8th Cir.1988), *cert. denied,* 492 U.S. 905, 109 S.Ct. 3214, 106 L.Ed.2d 565 (1989); *see also Brotherhood of Maintenance of Way Employees, Lodge 16 v. Burlington N. R.R.,* 802 F.2d 1016, 1022 (8th Cir.1986); *Sheet Metal Workers,* 893 F.2d at 203–04. The practice must be with the knowledge and acquiescence of employees. *See Maine Cent. R.R. v. United Transp. Union,* 787 F.2d 780, 783 (1st Cir.) *cert. denied,* 479 U.S. 848, 107 S.Ct. 169, 93 L.Ed.2d 107 (1986).

Here, the carriers claim numerous instances of past practice, citing leases of track to third parties at various locations in California, Oregon, Arkansas, Idaho, Texas, Kansas and Illinois. In one instance, the leasing involved TTX, which began leasing track at the Atchison, Topeka and Santa Fe yard in Chicago in 1984. The various lessees, including TTX, used the leased areas to repair their own cars.

The Carmen vigorously challenge the relevance of these other leases to the dispute before us. They assert that because their suit seeks a return to the status quo at certain specified locations where the carriers leased track to TTX *after* the service of the section 6 notices,[6] that evidence of past practices at other locations is irrelevant. The Carmen further argue that the carriers' examples of past practice are limited to situations in which the third parties used the leased tracks to repair refrigerator cars, which normally are not repaired by the carriers' Carmen, or to repair Amtrak passenger (not freight) cars. Countering the carriers' claims of widespread past practices, the Carmen point to affidavits attesting that the decades-long practice at the specified locations was that the Carmen exclusively performed the AAR repairs on all freight cars.

While it is indeed arguable that practices involving other types of rail cars at other locations may not establish implied agreements covering the repair of freight cars at the locations at issue, the opposite surely is also arguable. The type of past practice relied on need not be identical to the challenged practice to satisfy the carriers' burden of showing arguable contractual justification. *See Consolidated Rail,* 109 S.Ct. at 2485–89 (railroad's past practice of requiring drug testing as part of employee physicals only when a drug problem was known or suspected satisfied railroad's burden of showing arguable contractual justification when it began requiring routine drug screening of employees).

The carriers here bear a "light burden." Because their arguments of contractual entitlement are "not frivolous" nor "obviously insubstantial," we conclude that this dispute is a minor one. Our holding does not reach whether the Carmen are entitled to ultimately prevail before the Adjustment Board, nor does it address the persuasive force of their arguments. *See Sheet Metal Workers,* 893 F.2d at 204. We hold only that the merits of this dispute are for the Adjustment Board and not this court to determine. We therefore affirm the district court's grant of summary judgment on this issue.

### II.

The Carmen next argue that the district court improperly dismissed their state law claims that TTX tortiously interfered with the union's expectancy interests in negotiating new collective bargaining agreements. Before the district court, the union argued that TTX tortiously interfered with the Carmen's rights under express and implied agreements and also with its expectancy interests. The district court granted TTX's motion for dismissal on this issue, holding that because the tortious interfer-

---

6. Those locations are Kansas City, Kansas; Richmond, Oakland, and Los Angeles, California; Portland, Oregon; Chicago and Dupo, Illinois. The Carmen produced affidavits stating that at none of these locations except Chicago has anyone other than the carriers' Carmen performed the AAR repairs on regular freight cars.

ence claims depended on proof of breach of a collective bargaining agreement, those claims were preempted by the Railway Labor Act. *Brotherhood Railway Carmen,* slip op. at 12.

On appeal, the Carmen assert that their tortious interference claims do not depend on proof of an agreement or its breach, but rather are based on a "preexisting business relationship," a "reasonable expectancy of commercial relations" or a "prospective contractual relationship."

 Under Missouri law, a tortious interference claim does not depend on the existence of a contract and may indeed rest on "a reasonable expectancy of commercial relations." *Fischer, Spuhl, Herzwurm & Assocs., Inc. v. Forrest T. Jones & Co.,* 586 S.W.2d 310, 315 (Mo. banc 1979). Inevitably, however, determination of the Carmen's claims would involve interpretation of the collective bargaining agreements. If the carriers are ultimately found to be entitled under current agreements to enter into the leases with TTX, then it is difficult to see how a contractually permissible arrangement could serve as a basis for a tortious interference claim. Because the Carmen's state law claims require interpretation of the agreements, they are preempted by the "extraordinary" preemptive force of the Railway Labor Act. *Deford v. Soo Line R.R.,* 867 F.2d 1080, 1085 (8th Cir.); *cert. denied,* 492 U.S. 927, 109 S.Ct. 3265, 106 L.Ed.2d 610 (1989).

██ The union's tortious interference claims also must fail because the service of section 6 notices, divorced from proof of any past agreements, cannot be said to create a "reasonable expectancy" of a prospective contractual relationship. We thus affirm the district court's dismissal of the Carmen's tortious interference claims.

### III.

██ The Carmen next argue that TTX and the carriers conspired to violate certain provisions of the Railway Labor Act. Federal courts have no jurisdiction to review claims of a conspiracy to violate either a labor contract or federal labor law such as the Railway Labor Act. *See Russom v. Sears, Roebuck & Co.,* 558 F.2d 439, 441 n. 3 (8th Cir.1977), *cert. denied,* 434 U.S. 955, 98 S.Ct. 481, 54 L.Ed.2d 313 (1977); *Building Materials & Dump Truck Drivers, Local 420 v. Traweek,* 867 F.2d 500, 512 (9th Cir.1989).

We thus conclude that the district court correctly granted the carriers' motion for summary judgment and TTX's motion for dismissal, or in the alternative, for summary judgment on this claim.

### IV.

The Carmen also argue that the district court erred in denying their motions to compel discovery and to continue consideration of their opponents' motions as moot. We conclude the district court did not err in so ruling.

For the foregoing reasons, we affirm the judgment of the district court.

McMILLIAN, Circuit Judge, dissenting.

I respectfully dissent. I agree with the statement of law set forth by the majority. I disagree, however, with the analysis of plaintiff's argument.

Both parties concede there exist past practices which have risen to the level of an implied term, but they do not agree on what the past practices were. Carriers assert past practices allowed third parties to use leased tracks to repair their own cars. They argue that the dispute is over interpretation of this implied term and is thus a minor dispute.

Plaintiffs argue the past practice was for Carmen employed by the carriers to perform the maintenance and repairs. This concession that a past practice exists was considered by the district court to be an admission that the dispute concerned interpretation of a term in the contract. The district court, and now the majority, misinterpret plaintiff's argument. Plaintiff's assertion that a past practice is an implied term does not mean the term is necessarily the subject of the dispute but instead that a deviation from that implied term changes

the agreement. Such a dispute is considered "major."

If there was a deviation from any past practice which has risen to the level of an implied term, then the dispute is major, and the carriers are responsible for not maintaining the status quo of the agreement.

I would remand for the district court to determine whether the status quo was violated in this situation.