Air Line Pilots v. Guilford Trans.    CV-04-331-JD  10/13/04 P

UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE

Air Line Pilots Association,
International

        v.                              Civil No. 04-331-JD
                                        Opinion No. 2004 DNH 149
Guilford Transportation
Industries, Inc. *et al.*


                        O R D E R


     The defendants, Guilford Transportation Industries, Inc.

("Guilford"), Pan American Airways Corp. ("Pan Am"), and Boston-

Maine Airways Corp. ("Boston-Maine"), object to the magistrate's

report and recommendation ("R & R") that an injunction issue

against them pursuant to the Railway Labor Act, 45 U.S.C. § 152

("the RLA").  The plaintiff, Airline Pilots Association,

International ("ALPA") has filed a response to the objection.



                    Standard of Review

     ALPA's "motion for temporary restraining order and

preliminary injunction" was referred to the magistrate under 28

U.S.C. § 636(b)(1)(b) to conduct an evidentiary hearing and to

submit proposed findings of fact and recommendations for the

disposition of the motion.  This court must therefore conduct de

novo review of the report and recommendation.  Fed. R. Civ. P. 72(b); 14 James Wm. Moore et al., Moore's Federal Practice § 72.02[9], at 72-18 (3d ed. 2004).  Following this review, the court "may accept, reject, or modify the recommended decision, receive further evidence, or recommit the matter to the magistrate judge with instructions."  Fed. R. Civ. P. 72(b); see also 28 U.S.C. § 636(b)(1)(c).

Although the de novo standard does not compel a new hearing, the court "must give fresh consideration to those issues to which specific objections have been made."  12 Charles Alan Wright et al., Federal Practice & Procedure § 3072.2, at 374 (2d ed. 1997) (internal quotation marks and footnote omitted); accord Gioiosa v. United States, 684 F.2d 176, 178 (1st Cir. 1982).  Fresh consideration includes "at least, reading the transcripts of the testimony that relates to the objected-to portions of the magistrate judge's report."  Coolspring Stone Supply, Inc. v. Am. States Life Ins. Co., 10 F.3d 144, 147 (3rd Cir. 1993); see also R.I. Laborers' Health & Welfare Fund v. Philip Morris, Inc., 99 F. Supp. 2d 174, 176-77 (D.R.I. 2000).  With these principles in mind, the court turns to the defendants' objections.

<u>Background</u>[1]

ALPA brought this action to, <u>inter alia</u>, prevent the defendants from transferring the work of flying B-727 passenger aircraft from Pan Am to Boston-Maine. Although Pan Am has a collective bargaining agreement ("the CBA") in place with ALPA, who represents the majority of its pilots, the pilots of Boston-Maine are not unionized. Pan-Am and Boston-Maine are subsidiaries of the same parent company, Pan American Airlines, Inc. Guilford does not have any ownership interest in either Pan-Am or Boston-Maine, but leases 727s to both companies. Neither Boston-Maine nor Guilford is a party to the CBA.

Pan American Airlines, Inc., acquired the assets of Pan Am following its bankruptcy in June 1998. Boston-Maine was formed as a wholly owned subsidiary of Pan American Airlines, Inc., in

[1]The defendants concede that "[m]ost of the findings of fact in the [R & R] are supported by the record." Def. Obj. at 7. The following facts are therefore adopted from the R & R. Nevertheless, the defendants purport to object to the magistrate's recommended findings "<u>in their totality</u> on the grounds that they include facts that are insufficient to support the recommended order and <u>omit</u> numerous material facts that are undisputed and demonstrate conclusively that ALPA failed to meet its burden of proof . . . ." <u>Id.</u> Whether the findings support the recommended order as a matter of law is considered in the "Discussion" section, <u>infra</u>. To the extent the court considers any of the facts omitted from the R & R material to its analysis, they are discussed in that section as well.

March, 1999.  Since it was acquired, Pan Am has been losing money and has furloughed approximately two-thirds of the pilots it once employed.  Similarly, Boston-Maine has never turned a profit, although its operations have expanded.  Pan Am notified the Federal Aviation Administration in June 2004, that it intended to cease operations by October 31, 2004.

Although Pan Am has different personnel from Boston-Maine serving as the directors of various aspects of Pan Am's operations, the two entities have the same president, chief financial officer, and general counsel.[2]  Boston-Maine has hired a number of former Pan Am employees (including some into management-level positions), has used Pan Am employees to train Boston-Maine workers, and has specifically solicited job applications from Pan Am flight attendants.[3]  While Boston-Maine maintains its own operating specifications, procedures, facilities, programs, and accounts, it entered into a "support services and facilities agreement" with Pan Am in October 2001.

---

[2]All three of these men also hold the same position with respect to Guilford.

[3]This effort included a June 1, 2004, memorandum on Pan Am letterhead encouraging its flight attendants to apply to Boston-Maine which stated, in part, "This is where the company (Guilford) is headed so give it serious consideration."  Pl. Ex. 7, at 2.

Pan Am and Boston-Maine also operate a joint reservation system accessible from either company's website, and a route map on the Boston-Maine website includes Pan Am service (albeit in a different color from that of the Boston-Maine routes).

The magistrate heard testimony from Linda Toth, one of Pan Am's former regional managers, relating certain conversations with David Fink, the president of Pan Am, Boston-Maine, and Guilford. According to Toth, Fink regularly expressed his dislike for ALPA and even said in March or April 2004, that "it was going to be smooth sailing with Boston-Maine as soon as they got rid of all those union jackasses and life would be so much easier . . . ." Tr. Inj. Hrg. at 78:3-19 (Sept. 9, 2004). Toth also related Fink's statement that all of Pan Am's aircraft would soon be flying under the Department of Transportation operating certificate issued to Boston-Maine.

Over ALPA's objections, Boston-Maine received permission from the DOT and the FAA to operate 727 aircraft in July 2004, and began doing so in August 2004. Prior to that time, Boston-Maine had flown passengers only on Jetstream 3100 turboprop planes, which seat nineteen as opposed to the 149 passengers who can be accommodated by one of the 727s. At the hearing before

the magistrate, Pan Am pilots testified to an approximate twenty-five percent reduction in the number of hours that Pan Am offers them to fly each month since Boston-Maine started operating 727s, as well as to specific experiences suggesting that Pan Am was giving their work to Boston-Maine. According to the general counsel for all three defendants, Boston-Maine will operate the same service now performed by Pan Am after that entity's operations are discontinued.[4]

ALPA commenced this action on September 1, 2004, invoking this court's jurisdiction under the RLA. ALPA seeks, inter alia, an order enjoining the defendants "from utilizing Boston-Maine or any other alter ego operation to operate B-727s or other large jet aircraft for the purpose of transferring work and work opportunities of the Pan Am flight crewmembers" on the ground that to do so would interfere with the organization of Pan Am's pilots in violation of 45 U.S.C. § 152, Third and Fourth. Compl. at 16, 19. Asserting that this course of conduct would also

---

[4]In light of this testimony, the court adopts the magistrate's characterization of the cessation of 727 operations at Pan Am, followed by the commencement of those operations on the same routes at Boston-Maine, as a "transfer," despite the defendants' apparent objection to that term. See Def. Obj. at 35 ("Here, there has been no 'transfer' of work. The unchallenged record is that Pan Am is unfortunately going out of business . . . .")

violate the "status quo" provisions of the RLA codified at 45 U.S.C. § 152, First and Seventh, and 45 U.S.C. § 156, ALPA seeks to enjoin it "until all required bargaining, mediation and dispute resolution procedures of the RLA are exhausted."  Id.

With its complaint, ALPA filed a "motion for temporary restraining order and preliminary injunction."  The court referred this motion to the magistrate, who conducted an evidentiary hearing spanning September 9 and 10, 2004.[5]  In his subsequent report and recommendation, issued September 17, 2004, the magistrate proposed that

> upon the posting of adequate security by ALPA, that the defendants, Pan American Airlines, Inc., and their officers, agents, servants, employees, attorneys, and those persons acting in active concert or participation with them . . . be ordered to take the following acts:
>
> 1.   Restore to the status quo rates of pay, rules and working conditions of the Pan Am flight crewmembers as they existed on July 15, 2004, including but not limited to, all those embodied in the [CBA], until all

---

[5]The defendants objected to the "consolidation" of ALPA's requests for a restraining order and preliminary injunction for determination through a single hearing on the grounds that it unfairly foreclosed any opportunity for discovery.  The magistrate overruled the objection and denied the defendants' subsequent motion to continue the hearing "to conduct expedited discovery, particularly the depositions of [ALPA's] affiants to probe the foundation for their testimony and the averments contained in their affidavits."  The defendants did not object to either of the magistrate's orders in this regard.

required bargaining, mediation and dispute resolution
procedures of the RLA are exhausted.

2. Refrain from using Boston-Maine, or any other
affiliated operation, to operate B-727s or any other
large jet aircraft in service traditionally performed
by Pan Am and that Pan Am is capable of performing.

3. Refrain from transferring to Boston-Maine any
aircraft from the Pan Am certificate to the Boston-
Maine certificate.

R & R at 31.

On September 20, 2004, the court granted ALPA's motion for a

temporary restraining order, to the extent it required the

parties to maintain the status quo existing the day the R & R

issued, pending a ruling on the parties' objections. Following a

telephone conference with counsel on September 20, 2004, the

court amended the order to enjoin the defendants from issuing a

notice that Pan Am would be discontinuing its operations after

October 31, 2004, also pending a ruling on the parties'

objections. The court also directed the parties to file separate

briefing on the issue of security for the recommended injunction.

The defendants filed a timely objection to the R & R; both

parties filed the requested briefing on the bond issue.


Discussion

The defendants object to the report and recommendation on a number of grounds.  First, they argue that the transfer of work from Pan Am to Boston-Maine presents only a minor dispute, over which the court lacks jurisdiction under the RLA, because it is permitted under an arguable reading of the CBA.  Second, the defendants contend that the magistrate erred in determining that Boston-Maine is an alter ego of Pan Am such that the transfer of work from the latter to the former violates the status quo provisions of the RLA.  Third, the defendants argue that the record fails to show what they call the "extremely limited circumstances" appropriate for judicial relief under 45 U.S.C. § 152, Third and Fourth.  Fourth, the defendants challenge the magistrate's "conclusion that a preliminary injunction may issue under the RLA without the necessity of the plaintiff [sic] making the customary showing that it is entitled to equitable relief," i.e., irreparable injury, a balance of harms in its favor, and the public interest on its side.  Finally, the defendants make a series of objections to the "form" of the recommended order.  The court will address these objections in turn, then consider the issue of security for the injunction.

I.    Whether the Transfer to Boston-Maine Poses a Major Dispute

As the First Circuit explained in Bhd. of Locomotive Eng'rs

v. Springfield Terminal Ry., 210 F.3d 18 (1st Cir. 2000):

> Under the RLA, a district court has no jurisdiction to
> rule on the merits of a labor dispute.  Rather, the
> court may only decide what type of statutorily mandated
> dispute resolution procedure is appropriate, depending
> on the category of the dispute.  Minor disputes under
> the RLA are those in which the carrier's challenged
> policies are at least arguably permitted under the
> existing collective bargaining agreement.  If the
> dispute is "minor," the district court dismisses the
> case in favor of binding arbitration.  Major disputes,
> on the other hand, relate to carrier attempts to modify
> rates of pay, rules or working conditions in a fashion
> not even arguably covered by the collective bargaining
> agreement.  If the dispute is "major," the Act provides
> for extensive, non-binding mediation procedures.  In
> major disputes--unlike minor disputes--the RLA bars the
> carrier from implementing the contested change until
> the mediation efforts are exhausted.  To invest these
> status quo requirements with judicial authority, the
> district court is permitted to issue an injunction
> ordering the parties to maintain the pre-dispute status
> quo while the mediation procedures take place.

Id. at 23-24 (internal citations and footnotes omitted).  The

defendants object to the magistrate's determination that transfer

of work from Pan Am to Boston-Maine presents a major dispute,

authorizing the court to order the parties to maintain the status

quo until completing the RLA-mandated mediation process, on the ground that the transfer is arguably permitted under the CBA.[6]

In support of this objection, the defendants rely on the "scope clause" of the CBA, section 1.B, which provides:

> 1.    Except as provided in subsection 1.B.2, all flying by and for the service of [Pan Am] on aircraft owned or leased by and for [Pan Am] and utilizing the authority granted under [Pan Am's] operating certificate shall be conducted . . . by pilots whose names appear on the Pilots' System Seniority List . . . .
>
> 2.    Notwithstanding subsection 1.B.1, above, [Pan Am] may enter into aircraft interchange agreements with other carriers if such interchange agreements do not result in the furlough of any of [Pan Am's] pilots.

Pl. Ex. 1, at 2-3.  The defendants point out that an additional term proposed by ALPA, that Pan Am would "not create or acquire an alter ego to avoid the terms and conditions of the Agreement," Def. Ex. A, at 2, "was negotiated out" during the drafting of the

_____

[6]The defendants also argue that ALPA should be required to submit the issue giving rising to its request for a status quo injunction to arbitration.  Def. Obj. at 37-39.  Under the RLA, however, only minor disputes are subject to arbitration.  See Springfield Terminal, 210 F.3d at 23-24.  Although the defendants cite authority for the general proposition that "a district court must dismiss or stay proceedings . . . when a valid arbitration agreement exists which covers the subject of a claim, they do not explain the interplay of that doctrine with the mechanism of the RLA, and the defendants fail otherwise to explain it.  Id.  Accordingly, the court considers the defendants' argument in this regard unpersuasive.  See also R & R at 21-22.

CBA.[7]  Tr. Inj. Hrg. at 42:2-6 (Sept. 10, 2004).  Accordingly, the defendants argued to the magistrate that "ALPA's willingness to execute the CBA without its requested language makes it arguable that ALPA agreed that Pan Am could transfer its work to an affiliated non-union entity."  R & R at 20-21.  The magistrate rejected this claim as "obviously insubstantial."  Id.

The court agrees with the magistrate's reasoning that the omission of ALPA's proposed term from the CBA provides absolutely no basis for reading the opposite term into the agreement.  See R & R at 20.  Indeed, a CBA which allows the employer to avoid all of its attendant obligations through the use of an alter ego is not a CBA at all, but merely the grant of a unilateral option to the employer to de-unionize its operations.  See Ruby v. TACA Int'l Airlines, S.A., 439 F.2d 1359, 1363 (5th Cir. 1971) ("There is absolutely nothing about the [a]greement, or more fundamentally about the . . . role of collective bargaining agreements in assuring industrial peace, which contemplates that

_____

[7]In their objection, the defendants also rely on the fact that ALPA proposed a more expansive version of section 1.B.1 itself which did not end up in the final CBA.  The defendants' witness on the negotiations giving rise to the CBA never mentioned this point in his testimony, and the magistrate does not appear to have considered it.  The court therefore declines to take up the argument at this stage.

during the term the employer has the right (unilaterally) to bring it all to an end . . . .") (internal quotation marks omitted; ellipses in original). The court therefore agrees with the magistrate that the defendants' reading is far too dubious to engender only a minor dispute.[8] Cf. Sheet Metal Workers' Int'l v. Burlington N. R.R., 893 F.2d 199, 204 (8th Cir. 1990) (where scope clause limited to work on locomotives leased or purchased by employer, use of non-union labor on other locomotives despite contrary past practice presented only minor dispute).

In addition, the defendants do not appear to quibble with the magistrate's reliance on Springfield Terminal and cases from other circuits for the proposition that an employer's transfer of work to a non-union affiliate in and of itself triggers a major dispute under the RLA, provided the veil between employer and affiliate can be pierced. Compare R & R at 13-14 with Def. Obj. at 30-33. Instead, the defendants argue that none of these cases applies because the companies there "first sought to bargain with

---

[8]The court also concurs with the magistrate that the existence of Boston-Maine at the time the CBA was negotiated does not suggest that ALPA acquiesced in the diversion of its work for Pan Am to that entity, because "Boston-Maine did not operate 727 service similar to that offered by Pan Am when the CBA was negotiated." R & R at 18.

the union about whether it could 'divert' work to a non-union subsidiary or affiliate."  Def. Obj. at 31.  This argument advances a transparently strained reading of these cases to turn on the fact that "the court evidently viewed the company's prior attempt to bargain as an admission that [it] did not have the contractual right to subcontract the work" and that its subsequent position to the contrary could therefore not be "arguable" such that only a minor dispute arose.  Id.

Although some of these cases cited the employer's efforts to obtain union approval of the change in question before seeking to implement it through a non-union affiliate as evidence that the transfer was intended to avoid union obligations, none of them so much as suggested that such evidence is essential to the conclusion.  See Springfield Terminal, 210 F.3d at 29 (citing fact that "carrier only transferred work to the related corporation after unsuccessful union negotiations" as merely one non-dispositive factor in discerning whether "carrier used the related corporation for the purpose of evading the collective bargaining agreement and the status quo requirements of the RLA"); Burlington N. R.R. v. United Transp. Union, 862 F.2d 1266, 1274 (7th Cir. 1988) (noting that "Burlington's own conduct

undermines its position" on the presence of a minor dispute <u>after</u> concluding dispute was major).  Indeed, if the defendants were correct that the diversion of work to a non-union affiliate could never present a major dispute absent prior unsuccessful union negotiations on that point, it stands to reason that carriers would regularly seek to immunize themselves from pre-mediation injunctions by skipping the negotiations and going straight to the diversion.  Such a result would be plainly inconsistent with the policy of the RLA "to prevent the union from striking and to prevent management from doing anything that would justify a strike" pending mediation.  <u>Detroit & Toledo Shore Line R.R. v. United Transp. Union</u>, 396 U.S. 142, 150 (1969).

Accordingly, the court adopts the R & R insofar as it determines that Pan Am's transfer of its 727 operations to Boston-Maine constitutes a major dispute within the meaning of the RLA, subject to the discussion <u>infra</u> of the defendants' objection to the magistrate's finding that Boston-Maine constitutes an alter ego of Pan Am.


II.  <u>Whether Boston-Maine Is an Alter Ego of Pan Am</u>

The defendants claim that the R & R "errs in asserting that [Boston-Maine] is an 'alter ego' <u>simply because it is an affiliate</u>—-in effect holding that the mere existence of a related company operating in the same market ipso facto establishes alter ego and a per se violation of the RLA."  Def. Obj. at 4. Although the objection quotes at length from a case setting forth the standard for veil-piercing under the Federal Arbitration Act and from Judge Stahl's dissent in <u>Springfield Terminal</u>, the defendants acknowledge that the majority opinion in <u>Springfield Terminal</u> supplies the applicable standard for determining the existence of an alter ego for purposes of the RLA.  <u>Id.</u> at 34-35. In that case, the First Circuit advised that

> The corporate ties between the carrier and the related
> corporation provide only a starting point for the
> analysis.  Common ownership is by itself insufficient
> to pierce the veil.  The record must include evidence
> that the carrier used the related corporation for the
> purpose of evading the collective bargaining agreement
> and the status quo requirements of the RLA.  In making
> this determination, no single factor is dispositive.
> The district court may consider the chronology of
> events: if the carrier only transferred work to the
> related corporation after unsuccessful union
> negotiations, that fact may suggest that the carrier
> shifted the work in an effort to avoid the RLA status
> quo provisions.  That inference of evasion may be
> stronger when the work shifted to the related
> corporation is distinct from [its] primary line of
> business.  Other factors may be relevant, such as
> whether the carrier and the related corporation fail to

observe separate corporate formalities, or whether the
related corporation is undercapitalized.

We emphasize, however, that the record need not
portray the related corporation as a "sham" business,
expressly created or operated primarily to defeat the
RLA . . . . It would make little sense to ignore
current relationships and arrangements between
corporations, and thereby grant the [carrier] immunity
for veil piercing, in those cases where the related
corporation being used to defeat the RLA was originally
formed (or simultaneously used) for a legitimate
purpose.

210 F.3d at 25-26 (internal citations omitted). The defendants

argue that the evidence received by the magistrate establishes

only the common ownership of Pan Am and Boston-Maine and none of

the other factors deemed relevant by Springfield Terminal.

The court disagrees. The R & R specifically cites a number

of facts supporting the magistrate's conclusion that Boston-Maine

exists as an alter ego of Pan Am. Most significantly, the

companies have the same president, chief operating officer, and

general counsel, and Boston-Maine has regularly depended on Pan

Am's human resources, whether to train Boston-Maine's own

personnel or simply to come work for Boston-Maine outright.

R & R at 16-17. These facts establish more than the common

ownership of Pan Am and Boston-Maine--they establish their common

management. Within the close confines of this relationship, the

companies' owner intends to cease 727 operations at Pan Am and commence 727 operations at Boston-Maine to fly the same routes now serviced by Pan Am, even though Boston-Maine has flown only much smaller planes for nearly its entire existence.  This record readily permits, if not compels, the conclusion that Pan Am plans to use Boston-Maine "for the purpose of evading the [CBA] and the status quo requirements of the RLA."  Springfield Terminal, 210 F.3d at 25.  The court therefore adopts the magistrate's finding that Boston-Maine is Pan Am's alter ego for purposes of the RLA.


III.  Whether the Transfer Is a Direct Attempt to Destroy a Union
      Warranting Relief Under 45 U.S.C. § 152, Third and Fourth

The magistrate also accepted ALPA's alternative theory that the transfer of 727 operations to the non-union alter ego at Boston-Maine embodied a scheme to eliminate ALPA's representation of Pan Am personnel and thereby destroy the union, warranting relief under 45 U.S.C. § 152, Third and Fourth.[9]  R & R at 22-25.

_____

[9]Although the defendants remind the court in their objection that "'the post-certification rights of unions under Section 2 Third and Fourth are narrowly circumscribed,'" Def. Obj. at 40 (quoting Nat'l R.R. Passenger Corp. v. Int'l Ass'n of Machinists & Aerospace Workers, 915 F.2d 43, 53 (1st Cir. 1990)), they do not differ with the magistrate's conclusion that an employer's "direct attempt to destroy a union" violates those rights.  R & R at 24 (citing Nat'l R.R., 915 F.2d at 51)).

In support of this conclusion, the magistrate relied primarily on his findings that (1) the defendants intend for Boston-Maine to fly the same routes now serviced by Pan Am, but have no legitimate business purpose for this change, and (2) Fink expressed both a desire to "get rid" of ALPA and a plan for doing so. Id. at 24-25. The defendants complain that the magistrate improperly saddled them with the burden of proving a legitimate business purpose, Def. Obj. at 26 n.17, and that he erroneously credited Toth's testimony about Fink's statements. Id. at 41.

First, the court does not read the magistrate's statement that "the defendants cited no legitimate business purpose for starting a 727 operation at Boston-Maine," R & R at 24, as reflecting that he shifted any burden to the defendants. In the court's view, the statement expresses the magistrate's conclusion that the evidence disclosed no apparent reason to transfer 727 service to an affiliate which had not traditionally performed it--and, like Pan Am, which had never turned a profit--other than to eliminate the unionized operation at Pan Am. As discussed in section II, supra, the record provides ample support for this finding. The court therefore understands the challenged statement as an observation that the defendants had failed to

rebut this conclusion convincingly with either argument or evidence--a failure which persists at this stage of the proceedings.

In any event, regardless of whether the magistrate erred in relying on the absence of a legitimate business purpose for the transfer, Fink's statements alone provide sufficient support for the proposition that it represented an attempt to destroy a union. The defendants urge the court to reject Toth's testimony about those statements, calling her a "serial liar." Def. Obj. at 20. The magistrate, however, specifically found Toth to be a credible witness notwithstanding the defendants' attempts to impeach her. R & R at 8 n.4.

The Supreme Court has expressed skepticism over the rejection of a magistrate's recommended findings as to the credibility of a witness when those findings are dispositive, because "to do so without seeing and hearing the witness or witnesses whose credibility is in question could well give rise to serious questions . . . ." United States v. Raddatz, 447 U.S. 667, 681 n.7 (1980); see also Cullen v. United States, 194 F.3d 401, 407 (2d Cir. 1999); Hill v. Beyer, 62 F.3d 474, 482 (3d Cir. 1995). Significantly, the defendants invite the court simply to

reject the magistrate's finding that Toth was telling the truth _without_ asking to have her testimony heard anew.  Cf. United States v. Rosa, 11 F.3d 315, 328-29 (2d Cir. 1993) (noting that a district court having doubts about a magistrate's credibility findings should hear testimony from witness in question).  Having reviewed the record of both Toth's testimony and that of her former supervisor whom the defendants called to impeach her, the court finds no basis there for recalling either of those witnesses sua sponte.  Instead, the court adopts the magistrate's finding that Toth gave a credible account of Fink's statements.

Accordingly, the court adopts the magistrate's determination that the transfer of 727 operations from Pan Am to Boston-Maine constituted a "direct attempt to destroy a union" such that the practice was enjoinable under 45 U.S.C. § 152, Third and Fourth. Cf. Nat'l R.R., 915 F.2d at 52 (rejecting claim for relief under 45 U.S.C. § 152, Third and Fourth based solely on inferential evidence of anti-union animus).

IV. Whether ALPA Had to Satisfy Traditional Injunction Criteria

The defendants "object to the [R & R's] conclusion that a _preliminary_ injunction may issue under the RLA without the

necessity of the plaintiff [*sic*] making the customary showing that it is entitled to equitable relief."  Def. Obj. at 42.  The magistrate determined that "under the RLA . . .'district courts have subject-matter jurisdiction to enjoin a violation of the status quo pending completion of the required procedures, without the customary showing of irreparable injury.'"  R & R at 25 (quoting Consol. Rail Corp. v. Ry. Labor Executives' Ass'n, 491 U.S. 299, 302 (1989)).  In their objection, the defendants rely on a First Circuit case decided before Consol. Rail which they characterize as construing the term "labor dispute" in the Norris-LaGuardia Act, 29 U.S.C. §§ 101-115 to encompass the term "labor dispute" in the RLA.  Def. Obj. at 42 (citing Int'l Association of Machinists & Aerospace Workers v. E. Airlines, Inc., 825 F.2d 1141, 1145 (1st Cir. 1987)).  According to the defendants, this holding compels the conclusion that 29 U.S.C. § 107, which requires a court to identify the presence of the traditional equitable criteria before issuing "an injunction in any case involving or growing out of a labor dispute, as defined in this chapter," applies.

The magistrate rejected this argument as an "invitation to rule that the Supreme Court was wrong" in Consol. Rail.  R & R at

26. The defendants' objection fails to explain the error in this analysis, relegating their attempt to distinguish Consol. Rail to a six-line footnote.[10] Def. Obj. at 43 n.23. This court requires a considerably more convincing argument to persuade it not to follow Supreme Court precedent.

Although he rejected the defendants' argument as to the applicability of 29 U.S.C. § 107 to this case, the magistrate nevertheless went on to consider whether ALPA had shown irreparable harm, a balance of harms in its favor, and the public interest on its side. R & R at 27-31. He concluded that ALPA had succeeded in making these showings, id., and the defendants challenge this conclusion in their objection. Def. Obj. at 42-46. The court has considered the defendants' arguments in this

---

[10]The footnote cites a later First Circuit opinion in the E. Airlines case, issued subsequent to the Supreme Court's decision in Consol. Rail, for the proposition that the circuit continues to condition the issuance of a status quo injunction under the RLA upon a finding of the equitable criteria set forth at 29 U.S.C. § 107. Def. Obj. at 43 n.23 (citing 925 F.2d 6 (1st Cir. 1991)). This opinion, however, deals with the applicability of the bond requirement of the Norris-LaGuardia Act, rather than the criteria of 29 U.S.C. §§ 107(b)-(d), and nowhere discusses Consol. Rail. 925 F.2d at 9. Furthermore, the opinion explains the First Circuit's earlier holding in the case as "a controversy under the [RLA] can also be a labor dispute under the Norris-LaGuardia Act," rather than equating the two concepts, as the defendants would have it. Id. (emphasis added). Thus, the second E. Airlines opinion actually undermines the defendants' argument.

regard but considers them unpersuasive for essentially the same reasons set forth in the R & R. Accordingly, the court adopts the R & R to the extent it determines that ALPA need not satisfy traditional equitable criteria to secure an injunction under the RLA but that, even if ALPA must make such a showing, it has.

V. Objections to the "Form" of the Proposed Injunction

Finally, the defendants object to the injunction as recommended by the magistrate

> (1) because it is phrased as permanent relief, not as a temporary injunction; (2) because it restricts . . . Guilford, against whom no evidence was introduced except minimal overlapping management; (3) because it fails to make clear that Pan Am may continue with its announced orderly cessation of business; and (4) because it is not sufficiently specific as to what action [Boston-Maine] may and may not take.

Def. Obj. at 47. In its response, ALPA acknowledges that the recommended injunction "may be somewhat confusing or imprecise" as to the restraints it imposes on Boston-Maine. Pl. Resp. Def. Obj. at 37. ALPA also expresses its view that under the proposed order, "defendants would remain free (subject to potential damages claims and whatever other legal restrictions this [c]ourt would apply to such a shutdown decision) to discontinue Pan Am's operations altogether," provided they do not "replace Pan Am's

large-jet operations with identical operations by Boston-Maine."
Pl. Resp. Def. Supp. Mem. at 4-5 (footnote omitted).

The defendants' objection fails to explain in what way the proposed order is not "sufficiently specific" as to the future operations of Boston-Maine.  Although ALPA proposes alternative language in its response, the court believes that the proposal actually broadens the restrictions on Boston-Maine beyond those necessary to maintain the status quo.  Preventing Boston-Maine from operating any "B-727s or other large jet aircraft" does not necessarily reflect the state of things prior to the onset of the present dispute.  The court therefore adopts the proposed injunction in the language used by the magistrate.

The court also agrees with ALPA's understanding that nothing in the proposed order prevents the defendants from ceasing operations at Pan Am per se.  Instead, the recommended injunction requires the defendants to "[r]estore to the status quo the rates of pay, rules and working conditions of the Pan Am flight crewmembers as they existed on July 15, 2004, including but not limited to, all those embodied in the [CBA]" pending the outcome of the RLA procedures and prevents the transfer of certain Pan Am operations to Boston-Maine or another affiliate.  R & R at 31.

Without knowing the parameters of Pan Am's intended "cessation of business," this court cannot determine whether any aspect of it would offend the CBA or otherwise violate the status quo or, if so, whether a minor or major dispute would result. Accordingly, the court declines to entertain the defendants' general objection to the form of the order on the ground that it prevents Pan Am from shutting down its operations, without prejudice to either side to seek a modification of the injunction or other relief depending on what the future holds.

In this court's view, the defendants' first objection to the "form" of the order misapprehends the nature of a proceeding brought under the RLA. The only relief the court may grant is "to issue an injunction ordering the parties to maintain the pre-dispute status quo while the mediation procedures take place." Springfield Terminal, 210 F.3d at 24. The court "has no jurisdiction to rule on the merits of [the] labor dispute." Id. at 23. In a proceeding brought to enforce the status quo provisions of the RLA, then, the traditional distinction between preliminary and permanent injunctive relief would not seem to apply. Indeed, once the court identifies the presence of a major

dispute warranting a status quo injunction, there remains nothing left for the court to decide.

Nevertheless, this court acknowledges that the term "preliminary injunction" is often used to describe a court's order to maintain the status quo issued pursuant to the RLA. More significantly, ALPA styled its request for relief in this case as a "motion for temporary restraining order and preliminary injunction." Under these circumstances, the defendants might have believed that any resulting order would require them to maintain the status quo on only a temporary basis until the court could have a full-fledged hearing on ALPA's claims.

Yet in this case, the magistrate has already conducted an evidentiary hearing where each side was permitted to call its own witnesses and cross-examine the other's, introduce documentary evidence, and present arguments. The defendants' objection does not make clear what they believe remains to be done before the recommended injunction becomes "permanent," i.e., does not await the completion of any further proceedings in this court. Although the defendants sought pre-hearing discovery before the magistrate, he refused to grant it, and the defendants never appealed those rulings to this court.

Against this procedural background, the court considers it appropriate to permit the defendants to show cause why proceedings in this court should continue following the adoption of the R & R. The defendants shall file a brief to that end by October 18, 2004, if they wish to pursue the issue. ALPA shall file its response, if any, by October 21, 2004. In the meantime, the injunction will issue as recommended.

Finally, the court considers Guilford's objection to being subject to the injunction to be without merit. The magistrate's findings, as adopted by this court, make clear that it was Guilford who was orchestrating the diversion of work from Pan Am to Boston-Maine. R & R at 17-18. Therefore, to have its appropriate effect, the order must extend to Guilford. <u>See</u> <u>Springfield Terminal</u>, 210 F.3d at 30.

VI.  The Appropriate Amount of the Bond for the Injunction

The magistrate recommended that his proposed injunction issue "upon the posting of appropriate security by ALPA."  R & R at 31.  ALPA does not object to this requirement in the first instance, but only to the defendants' suggestion that "the only adequate undertaking to secure ongoing operations [at Pan Am] will be an open ended, no-interest, non-recourse credit line from a reputable financial institution to be arranged by ALPA" to cover all of Pan Am's projected losses "pending a full hearing on the merits."  Def. Supp. Mem. at 10-11.  To the contrary, ALPA contends that the amount of the bond should not exceed $50,000.

Section 7 of the Norris-Laguardia Act, which ALPA concedes is applicable to the magistrate's recommended order, states that

> no temporary restraining order or temporary injunction shall be issued except on condition that complainant shall first file an undertaking with adequate security in an amount to be fixed by the court sufficient to recompense those enjoined for any loss, expense, or damage caused by the improvident or erroneous issuance of such order or injunction, including all reasonable costs (together with a reasonable attorney's fee) and expense of defense against the order or against the granting of any injunctive relief sought in the same proceeding and subsequently denied by the court.

29 U.S.C. § 107.  The defendants contend that their "loss, expense, or damage" caused by the recommended injunction includes

Pan Am's operating losses going forward, as well as the costs of indemnifying their customers for any losses in rebooking flights scheduled on Pan Am with other carriers.

As discussed supra, however, the proposed injunction does not by its terms require Pan Am to remain in business. It simply (1) requires Pan Am to restore the rates of pay, rules, and working conditions with regard to its flight crewmembers, including those required by the CBA, as they existed prior to July 15, 2004, and (2) prevents Pan Am from transferring certain of its operations to Boston-Maine or another affiliate. Rather than explaining how restoring the status quo in this way would itself injure Pan Am, the defendants have pressed the seemingly irrelevant argument that staying in business would injure Pan Am. The defendants have also failed to explain how their inability to shift Pan Am's 727 operations to Boston-Maine would lead to the losses they describe, because it is unclear that Boston-Maine would lose any less money on those flights than Pan Am would.[11]

---

[11]The defendants claim that DOT regulations will require Pan Am "to pay some or all of its customers the fare differential between what they are charged upon rebooking [a scheduled Pan Am flight with another carrier] and the cost of their Pan Am ticket" once Pan Am shuts down its operations because it has not been able to notify customers of that eventuality. Def. Supp. Mem. at 3-4. As an initial matter, the defendants do not cite to the regulations in question, and the plain language of the DOT rule

Accordingly, the court will not require ALPA to post security for any of the costs described in sections I or II of the defendants' supplemental memorandum. See Div. I, Detroit, 844 F.2d at 1226-29 (vacating $750,000 bond for RLA injunction without "specific evidence supporting [carrier's] claim that the status quo injunction placed [it] in immediate financial peril"); Bhd. of Maintenance of Way Employees, Lodge 16 v. Burlington N. R.R., 642 F. Supp. 41, 49 (N.D. Iowa 1985) (refusing to require bond for RLA injunction where "harm which may be sustained by the defendant should the grant of preliminary injunction be ultimately found improper . . . is contingent on the happening of events other than those directly affected by the injunction"), rev'd in part on other grounds, 802 F.2d 1016 (8th Cir. 1986).

"Section 7 of the Norris-LaGuardia Act clearly expresses the congressional intent to require that preliminary injunction

_____

referenced (without further authority) in their previous submission on this point does not readily support their position. Furthermore, the defendants' estimate of their anticipated "indemnification" costs is highly speculative, based solely on their general counsel's multiplying the number of passengers booked to fly Pan Am in November, 2004, by one hundred dollars. The court will not require ALPA to post security for expenses that Pan Am has not convincingly shown will occur, either at all or anywhere near the estimated amount. See Div. I, Detroit Bhd. of Locomotive Eng'rs v. Consolidated Rail Corp., 844 F.2d 1218, 1226-29 (6th Cir. 1988).

undertakings in labor disputes include a provision for reasonable attorneys' fees." E. Airlines, 925 F.2d at 9. Again, ALPA concedes that section 7 applies here. Nevertheless, ALPA challenges the defendants' assertion that the bond should include their "approximately $148,000" in legal expenses to date in opposing ALPA's request for an injunction, which assertedly "will more than double" when they act on their stated intention to appeal this order to the First Circuit on an expedited basis. Def. Supp. Mem. at 5. ALPA argues that 29 U.S.C. § 107 requires that the bond include "a reasonable attorneys' fee" but that the defendants have failed to adduce any evidence that $148,000 represents a reasonable figure.

The court agrees. The only evidence the defendants have submitted in support of the $148,000 figure is their general counsel's statement to that effect in his declaration.[12] The declaration, however, provides no itemization whatsoever and, indeed, does not even report the hourly rate the defendants paid in connection with this matter or the number of hours expended. Furthermore, the declaration does not furnish any estimate as to

---

[12]Although the declaration was filed under seal, the defendants cite to this portion of it in the unsealed version of their supplemental memorandum filed with the court as a courtesy.

the fees likely for any appeal; the "more than double" figure appears only as a representation in the brief itself. Finally, the general counsel does not offer any opinion (of his own or anyone else's) that the $148,000 sum is reasonable in terms of the complexity of work or the quality of representation.[13]

On this record, the court cannot conclude that $148,000 represents the defendants' "reasonable attorney's fee" for this matter within the meaning of 29 U.S.C. § 107. ALPA proposes that "[g]iven the dearth of evidence" as to the defendants' actual damages in the event the injunction is erroneous, "the amount of the undertaking in this case, at least initially, should not exceed $50,000." Pl. Resp. Def. Supp. Mem. at 8. The court agrees with this approach. Cf. E. Airlines, 925 F.2d at 8-10 (affirming bond requirement including defendant's attorneys' fee on appeal by plaintiff where it had stipulated to minimum amount of fee). Moreover, in setting the amount of a bond for an injunction under the RLA, "the court should be sensitive not only

---

[13]Although the defendants purport to hold back on "evidence going directly to the amount of the bond" in their supplemental memorandum, they purport to do so on the theory that "until the terms of the order are known [they] cannot fairly estimate the impact on their business operations." Def. Supp. Mem. at 2 n.1. They do not claim to suffer from any similar uncertainty with regard to attorneys' fees, particularly those that have already been incurred.

to the enjoined party's need for security against financial loss, but also to the moving party's right to relief and the Act's goal of preventing unilateral actions in major disputes." Div. 1, Detroit, 844 F.2d at 1226-27; accord E. Airlines, 925 F.2d at 9 (noting that in RLA case, "a district court retains substantial discretion to dictate the terms of an injunction bond"). Requiring ALPA to secure an open-ended, interest-free, non-recourse line of credit on Pan Am's behalf, as the defendants suggest, would show little sensitivity to ALPA's right to pursue relief in this case.

The court concludes that ALPA's proposed $50,000 bond appropriately strikes the balance between the defendants' need for security should the injunction prove improper and ALPA's right to seek relief from the planned shift of work from Pan Am to Boston-Maine. Accordingly, ALPA shall forthwith submit to the court the $50,000 letter of credit referenced in its October 8, 2004, filing as security for the injunction hereby issued.

## Conclusion

For the foregoing reasons, the court hereby adopts the magistrate's report and recommendation issued in this matter on

September 17, 2004, in its entirety, including the terms of the proposed injunction. For purposes of convenience and clarity, the court issues a separate "Injunction Order" herewith setting forth those same terms. The defendants shall show cause by October 18, 2004, why there should be any further proceedings on this matter in this court. ALPA shall file any response thereto by October 21, 2004. ALPA shall immediately file with the court registry the $50,000 letter of credit referenced in its October 8, 2004, notice. Upon receipt of the letter of credit, the temporary restraining order issued pending the court's decision on the R & R (document no. 36) and the subsequent order of

amendment (document no. 44) shall be dissolved and the injunction

shall become effective forthwith without further court action.

SO ORDERED.

_Joseph A DiClerico. Jr._
Joseph A. DiClerico, Jr.
United States District Judge

October 13, 2004

cc:  Andrew W. Serell, Esquire
     Julie P. Glass, Esquire
     Marcus C. Migliore, Esquire
     Eric L. Hirschhorn, Esquire
     Joseph E. Schuler, Esquire
     R. Matthew Cairns, Esquire
     William G. Miossi, Esquire
     Marie M. McPartlin, Esquire
     Eric L. Hirschhorn, Esquire